**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **CLEVERLAND HOLDINGS, LLC,** : | |
| **d/b/a EMBRACE INSURANCE** : | |
| **AGENCY, LLC,** : | CIVIL ACTION |
| : | |
| Plaintiff, : | DOCKET NO. |
| v. : | |
| : | |
| **JENNIFER MAHAN, a/k/a JENNA** : | |
| **MAHAN and FETCH INSURANCE** : | |
| **SERVICES, INC.** | |
| | |
| Defendants. | |

**VERIFIED COMPLAINT
FOR INJUNCTIVE AND OTHER RELIEF, AND DAMAGES**

Plaintiff Cleverland Holdings, LLC ("Cleverland"), by and through its undersigned

counsel, Fox Rothschild LLP, hereby files the following Verified Complaint against Defendants,

Jennifer Mahan ("Mahan" and Fetch Insurance Services, LLC  ("Fetch") (collectively

"Defendants") for their actual, threatened, and imminent (i) breach of contract; (ii) tortious

interference with contractual relationship; (iii) violation of the Federal Defend Trade Secrets Act;

(iv) violation of the Ohio Uniform Trade Secrets Act; (v) civil conspiracy; (vi) Mahan's breach of

her fiduciary duty; and (vii) permanent injunctive relief under Ohio's Declaratory Judgement Act.

In support thereof, Cleverland avers as follows:[1]

## I.  INTRODUCTION

1.     This case concerns a dispute between Cleverland, which does business as Embrace

Pet Insurance and which is in the business of selling and underwriting comprehensive pet insurance

---

[1] Following the filing of this Verified Complaint, Cleverland is also bringing a Motion for an
Emergency Preliminary Injunction (Temporary Restraining Order) forthwith.

products, and a former high ranking employee, Defendant Mahan, who resigned from Cleverland to take an identical position with Fetch, a direct competitor of Cleverland, in violation of restrictive covenants contained in an employment agreement.  A true and correct copy of Defendant Mahan's Non-Compete, Assignment and Confidentiality Agreement (the "Agreement") is attached hereto as Exhibit 1.

2.      By email on July 12, 2023, Mahan resigned from her position as the Director of Claims and Underwriting for Cleverland to accept a nearly identical position at Fetch.  A true and correct copy of Defendant Mahan's resignation email is attached hereto as Exhibit 6.

3.      Earlier that day, Mahan utilized a loophole in Cleverland's computer systems, which has since been patched, to access a wide range of files and folders outside of the scope of her employment and, upon information and belief, compressed those folders and files into a ZIP folder that she then improperly exported from Cleverland through the use of her personal Gmail account.

4.      On July 13, 2023, Cleverland's counsel wrote to Mahan, advised her that she was contractually prohibited from working for Fetch, and that Cleverland was prepared to file suit to enforce the same.  A true and correct copy of that July 13, 2023 letter is attached hereto as Exhibit 7.

5.      On July 17, 2023, Cleverland's counsel wrote to Fetch, advised it that Mahan was contractually prohibited from working for Fetch, and that Cleverland was prepared to file suit to enforce the same. A true and correct copy of that July 17, 2023 letter is attached hereto as Exhibit 8.

6.      By taking a position with Fetch, Defendant Mahan is in violation of her  Agreement with Cleverland.  *See* Ex. 1.

7.     Further, due to the nature of her high ranking position and her extensive work history with Cleverland, Defendant Mahan is in direct possession of Cleverland's confidential, proprietary, and trade secret information and will inevitably disclose, use, or misappropriate Cleverland's confidential, proprietary, and trade secret information in an identical role at Fetch.

8.     As set forth more fully below, Cleverland seeks injunctive relief to prevent this actual and/or threatened misappropriation of its trade secrets and to enforce the terms of its Agreement with Defendant Mahan, as well as damages, attorneys' fees, and other permissible relief.

9.     By virtue of her position with Cleverland, Mahan has intimate knowledge of Cleverland's confidential information and trade secrets involving insurance plans and rates charged, and will use this proprietary information to Mahan and Fetch's benefit, and Cleverland's detriment. Cleverland seeks injunctive relief and damages to protect itself from significant economic harm resulting from Defendants' actions.

## II.    THE PARTIES

10.     Cleverland is wholly owned by its sole member, NSM Insurance Services, LLC, which is a Texas limited liability company.  NSM Insurance Services, LLC is wholly owned by its sole member, NSM Insurance Group, LLC, which is a Delaware limited liability company. NSM Insurance Group, LLC is wholly owned by its sole member, NSM Insurance Holdco, LLC, a Delaware limited liability company.  NSM Insurance Holdco, LLC, is wholly owned by its sole member, White Mountains Catskill Holdings, Inc.  White Mountains Catskill Holdings, Inc. is a Delaware corporation with a principal place of business at 23 South Main Street, Suite 3B, Hanover, New Hampshire 03755.

11.     Cleverland is indirect wholly owned subsidiary of Riser Holdings, L.P.

3

12.     Cleverland in the business of specialty insurance programs and brands focused on niche areas such as pet insurance. Cleverland owns and does business as Embrace Insurance Agency, LLC—a top-rated, nationwide provider of personalized, affordable and easy-to-use pet health insurance for dogs and cats and trades as Embrace Pet Insurance.

13.     Upon information and belief, Defendant Mahan is an adult individual who resides at 10070 Chardon Road, Chardon, Ohio 44024.

14.     Upon information and belief, Defendant Fetch is a Delaware Corporation with a registered address through The Corporation Trust Company, located at Corporation Trust Center, 109 Orange Street, Wilmington, Delaware 19801 and a physical address located at 101 Greenwich Street, New York, New York 10006.  Defendant Fetch is also a "specialty insurance company," engaged in the business of pet veterinary insurance for dogs and cats.  *See* fetchpet.com, Last visited on July 25, 2023, *https://www.fetchpet.com/.*

15.     In or around 2021, the pet insurance provider "PetPlan" changed its name and rebranded itself as "Fetch by the Dodo."  *See* Exhibit 3.

### III.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over this matter based upon federal question jurisdiction.

17.     Under 28 U.S.C. § 1331, district courts shall have original jurisdiction of all civil actions arising under the laws or treaties of the United States.

18.     Cleverland brings this lawsuit under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

19.     Venue is proper in the District Court for the Northern District of Ohio because the Agreement at issue requires that any claim or controversy be brought within courts of competent jurisdiction in Cuyahoga County, Ohio.  *See* Ex. 1 at ¶10.

20. Additionally, the the Agreement indicates that the laws of the State of Ohio shall govern the Agreement. *Id.* at ¶9.

### IV. FACTUAL BACKGROUND

**Mahan Begins Working for Cleverland Subject to Restrictive Covenants Within her Employment Agreement.**

21. Mahan was formerly employed with Cleverland as the Director of Claims and Underwriting for Cleverland, which does business as Embrace Pet Insurance.

22. In or around 2011, when Cleverland hired Defendant Mahan, she executed a Non-Complete, Non-Competition, and Inventions Assignment Agreement (the "Agreement") as a condition of employment. *See* Ex. 1.

23. As consideration for Mahan's employment with Embrace, Mahan was barred from accepting a position at a "Competing Business" while employed by Cleverland. *Id.* at ¶6.

24. A "Competing Business" is anyone, other than Cleverland, that offers or is planning to offer competing services such as the sale of pet insurance, and specifically includes named competitors such as Veterinary Pet Insurance, Pethealth Inc., and **PetPlan**. *Id.* at ¶14. (emphasis added).

25. As further consideration for her employment, Mahan agreed that, for a period of one year from the date of her release or resignation, she would not perform professional services like those performed for Cleverland for any of Cleverland's key competitors, including PetPlan. *Id.* at ¶6.

26. For a period of one year after her last day of employment, Mahan was also barred from advising or assisting a client of Cleverland to obtain covered services from a competing business, soliciting Cleverland employees to work for a competing business, or divert business opportunities away from Cleverland to a competing business. *Id.*

5

27. For a period of two years after her last day of employment, Mahan agreed not to become employed by, or provide any services or assistance to, any Competing Business, which specifically includes PetPlan, that offered covered services such as the sale of pet insurance, within the state of Ohio. *Id.* at ¶7(a).

28. Mahan accepted these terms as consideration for her employment with Cleverland, and developed professionally over her twelve year career while enjoying a position of trust which gave her unfettered access to Cleverland's confidential documents and proprietary information.

29. Mahan expressly recognized that the restrictions and the scope of the prohibitions in the Agreement were reasonable and necessary given Cleverland's business.

30. Mahan also agreed that any violation of the non-competition and non-solicitation provisions in the Agreement would cause Cleverland irreparable injury, and that Cleverland "may seek and obtain temporary, preliminary, and permanent injunctive relief, in addition to any other relief to which Company may be entitled, without having to post a bond or other security." *Id.* at ¶8.

31. Further, on February 6, 2020, Defendant Mahan acknowledged receipt of Cleverland's Code of Conduct, which reaffirmed her obligations under the Agreement. A true and correct copy of Cleverland's Code of Conduct, including Defendant Mahan's signature acknowledging receipt, is attached hereto as Exhibit 2.

32. Specifically, with respect to Confidentiality, the Code of Conduct incorporates the Agreement and provided the Defendant Mahan was required to "maintain the confidentiality of confidential information entrusted to [her] by [Cleverland]" and to take steps to guard against the unintentional disclosure of Cleverland's confidential information. Ex. 2 at ¶9.

33. The Code of Conduct, again incorporating the terms of the Agreement, also provides that Defendant Mahan was required to safeguard and make efficient use of Cleverland's

property, including its intellectual property, confidential information, and trade secrets.  Ex. 2 at ¶10.

34.     The Code of Conduct specifically obligated Defendant Mahan to, *inter alia*, protect the confidentiality of Cleverland's business and marketing plans, databases, records, salary information, and unpublished financial data, all of which Cleverland depends upon and made significant investments to produce and maintain that information, all of which provides Cleverland with a competitive advantage over its competitors.

**PetPlan Pet Insurance Changes Its Name to "Fetch Pet Insurance."**

35.     Mahan agreed not to accept employment with PetPlan while employed by Cleverland, not to perform professional services like those performed for Cleverland for PetPlan for one year after her resignation, and not to become employed by, or provide any services or assistance to PetPlan, provided that they offer covered services such as the sale of pet insurance within the state of Ohio, for two years after her resignation.  Ex. 1, ¶¶ 6, 7.

36.     In or around October 2020, a private equity firm purchased a minority stake in PetPlan and rebranded it as "Fetch By the Dodo."  *See* Exhibit 3, Sahil Patel, *The Dodo, Group Nine's Animal Brand, Is Getting Into Pet Insurance*, Wall St. J. (Oct. 19, 2020, 6:00 AM)

37.     The rebranding of PetPlan Pet Insurance to "Fetch" was expected to occur in May of 2021.  *Id.*

38.     Fetch by the Dodo's website acknowledges that it was formerly known as "PetPlan", and that "there has been **no change at all** to [its] pet insurance…the name and logo are the only thing that's different."  *See* Exhibit 4., Fetchpet.com, last visited on July 25, 2023, *https://www.fetchpet.com/faqs/is-petplan-now-fetch-by-the-dodo.* (emphasis original).

39.     Fetch also provides pet insurance within the "Restricted Area" under the Agreement, as Fetch provides pet insurance policies to residents of the State of Ohio.  *See* Exhibit

7

5, Fetchpet.com, last visited on July 25, 2023, *https://www.fetchpet.com/locations/oh-pet-insurance*.

40.     Even if PetPlan, now known as Fetch, was not specifically and repeatedly identified as a "Competing Business" under the Agreement, Fetch provides "Covered Services" as defined under the Agreement, as Fetch advertises itself as "the most comprehensive pet insurance there is and offers health advice from veterinarians and pet-loving experts."  *See* Ex. 5.

41.     Fetch engages in interstate commerce and sells products and services in the pet insurance space in all fifty states.  *See* Fetchpet.com, last visited on July 25, 2023, *https://www.fetchpet.com/locations*.

**Mahan Resigns from Cleveland to Work In the Same Capacity for Fetch.**

42.     At the time of her resignation in July 2023, Mahan rose to the level of the Director of Claims and Underwriting with Cleveland.

43.     In that capacity, her responsibilities included the following:

    a.  Manage the claims department, including supervising and training staff, handling escalated customer service inquiries, and ensuring that claims are processed accurately and efficiently;

    b.  Develop and implement policies and procedures to ensure compliance with regulatory requirements and industry standards;

    c.  Oversee the underwriting department, including managing underwriting staff, reviewing and analyzing underwriting data, and making recommendations to senior management;

    d.  Develop and maintain relationships with key stakeholders, including regulatory agencies, industry associations, and other insurance providers;

    e.  Monitor and analyze claims data to identify trends and opportunities for process improvements;

    f.  Work with the marketing and sales teams to develop and implement marketing strategies to drive new business and retain existing customers;

g.  Participate in industry conferences and events to stay current on trends and emerging issues in pet insurance; and,

h.  Drive innovation within the claims space and develop automation solutions to improve operational efficiencies.

44.  In the course of her employment with Cleverland, Mahan gained knowledge of Cleverland's confidential information and trade secrets, including pricing, claims, and underwriting information, client lists and contact information, proprietary policy forms, ISO rating systems, underwriting guidelines, strategic plans, and marketing strategies and developed relationships with many of Cleverland's actual and potential clients.

45.  Mahan was provided access to Cleverland's full depth and scope of information about products, pricing, strategic plans, marketing, customers, and was a key part of Cleverland's marketing and client development/retention efforts.

46.  Upon information and belief, Mahan leveraged her knowledge and possession of the proprietary information she obtained from Cleverland to obtain employment with one of Cleverland's direct competitors, Fetch.

**Mahan Accesses Cleverland's Confidential Information and Documents Hours Before She Resigns**

47.  On July 12, 2023, Mahan, who had a known habit of logging into Cleverland's systems after 9 AM on most days, logged into Cleverland's network using her username and password at 7:58 AM and proceeded to access and/or modify a number of files and folders.

48.  Those files and folders related specifically to, *inter alia*, Cleverland's claims forecasts, claims adjuster meetings, monthly reports, and productivity, claims chat, human resources, payroll, budgets, licensing documents, ongoing complaints, claims communications, meeting files, and professional applications. *See* Exhibit 12.

49.     Each of the folders accessed by Mahan during this time contains trade secret, confidential, and/or proprietary information that Cleverland takes reasonable steps to protect due to their independent financial value to Cleverland.

50.     Mahan had no legitimate business reason to access those files or folders mere hours before her resignation after which her access to those same files was removed.  *See* Macias Aff., at ¶32.

51.     At that same time, Mahan exploited a fault in Cleverland's systems that has since been ameliorated to access her personal Gmail account from her Cleveralnd laptop using an Incognito browser.  *Id.,* at ¶¶33, 34.

52.     By exploiting that vulnerability, Mahan was able to access her personal Gmail account from within Cleverland's network, which she did at that time, and, upon information and belief, exported files and/or folders that she accessed on Cleverland's network by sending compressed ZIP files containing Cleverland's property through her personal Gmail account.

53.     Mahan continuously accessed, modified, and/or created files with the following file paths on July 12 between 7:58 a.m. and 8:59 a.m. EST:

- R:\Claims\Reporting\Claims Forecast\Claims Forecast.xlsx

- My Computer\R:\Claims Management\Adjuster Monthly Reports

- My Computer\R:\Claims Management\Admin Brain\Claims Chat Feature

- My Computer\R:\Claims Management\Audits\Admin Audits

- My Computer\J:\Adjuster Licensing\Individual Adjuster Documents

- C:\Users\jsm\OneDrive - Embrace Pet Insurance\Documents\Payroll

- C:\Users\jsm\OneDrive - Embrace Pet Insurance\Documents\templates

- C:\Users\jsm\OneDrive - Embrace Pet Insurance\Documents

*See* Espiritu Aff., at ¶10.

54.     Within these critical hours on July 12 before she resigned, Mahan also sent sixty-one (61) files to her recycle bin for deletion between 8:36 a.m. and 8:38 a.m. EST.  *Id.,* at ¶10.

55.     Later that day, Mahan contacted her direct supervisor, the President of Embrace Pet Insurance, Brian Macias, by videoconference and informed him that she was resigning from her position at Cleverland and had accepted a job at Fetch.  She further indicated that she would be performing essentially the same job for Fetch.  *See* Macias Aff., Ex. 9, at ¶20.

56.     Mahan then followed that videoconference by sending an email at 2:20 PM with the subject line, "My resignation letter."  A true and correct copy of the email is attached hereto as Ex. 6.

57.     After reading the email, Macias contacted Mahan by SMS message and inquired whether Mahan had reviewed her non-compete agreement.  A true and correct copy of the SMS exchange is attached as Exhibit 10.

58.     Mahan advised that she was aware of the language of her non-compete agreement and she "had a lawyer look and Fetch's counsel looked" at the agreement.  She explained that her lawyer and Fetch's counsel:

> 'weren't concerned.'  Said they're [*sic*] a general rule that if it's for more than a year they throw them out.  And if it [*sic*] a niche business it would put undue hardship on the employee and would likely be thrown out if taken to court.  Just telling you what they told me.

*See* Ex. 10.

59.     On July 12, 2023, after giving notice of her resignation, Cleverland immediately blocked Mahan's access to her email and computer in an effort to protect itself against Mahan's misappropriation and/or theft of trade secrets.

60. On July 13, 2023, Cleverland, through its undersigned counsel, sent a notice letter reminding Mahan of her obligations under the Agreement. *See* Ex. 7, the "Mahan Letter."

61. On July 17, 2023, Cleverland through its undersigned counsel sent a notice letter to Fetch providing the Agreement and putting Fetch on notice that Mahan's employment would violate the Agreement. *See* Ex. 8, the "Fetch Letter."

62. Due to the role Mahan held at Cleverland, and the fact that she accepted employment with Fetch, Mahan is in clear violation of her Agreement. *See e.g.* Ex. 1 at ¶¶6, 7(a) – (f).

63. Mahan's competition with Cleverland will adversely impact Cleverland's business for at least the next two years. The Fetch product offerings are similar, its network of agents overlap with Cleverland, it operates in the same markets as Cleverland, and Mahan's role at Fetch has overlapping duties and responsibilities with the role she held at Cleverland.

64. Further, Mahan's employment at Fetch will likely lead to the unlawful use and disclosure of Cleverland's protected information. Indeed, this is information that Mahan acquired from her employment at Cleverland – she cannot unlearn what she already knows. That is precisely why Cleverland asked – and Mahan agreed – not to compete with Cleverland. Ex. 1 at ¶¶6 and 7.

65. The Agreement does not prohibit Mahan from working in the insurance industry (or any other field). To the contrary, it is narrowly tailored to prohibit her from using the confidential and proprietary information she learned at Cleverland to compete directly with Cleverland in the pet insurance space.

66. Mahan ignored her contractual obligation and did exactly what Cleverland feared: she accepted a position with a direct competitor and is using, or will use, confidential and proprietary information that belongs to Cleverland to compete against it.

**Cleverland Protects its Confidential Information**

67.     Cleverland has spent significant time, effort, and money to develop, acquire, maintain, and protect its confidential and proprietary business information, including, *inter alia,* information concerning Cleverland's and customers, clients, and potential clients, including about their purchase histories, needs, preferences, claims history, claims forecasts, and decisionmaker identities and contact information; Cleverland's sales and marketing forecasts, strategies, and processes; Cleverland's operational and logistical capabilities, strengths, weaknesses, and related strategies and assessments; Cleverland's expenses, profits, profit margins, accounts, claims, payroll data, and other financial data; Cleverland's internal processes, computer systems, security safeguards, and physical and electronic intrusion detection and prevention systems; Cleverland's Covered Inventions; Cleverland's lists, extracts or summaries of any of the foregoing; and anything else that qualifies for protection as a trade secret under the law which is not in the public domain (herein after individually or collectively referred to as "confidential information"). *See* Ex. 1 at ¶14.

68.     For example, some of Cleverland's confidential information and trade secrets for which Mahan had access included pricing and underwriting information, client lists and contact information, proprietary policy forms, ISO rating systems, claims information, underwriting guidelines and policies, strategic plans, business plans, and marketing plans and strategies, all of which has a useful life of at least two to five years.

69.     To protect its trade secret, confidential, and proprietary business information, Cleverland takes a variety of steps including (1) restricting trade secret from employees who do not need to know the information; (2) requiring employees to review and acknowledge Cleverland's confidentiality policies, including those contained in the Code of Conduct; (3) requiring key employees to sign confidentiality, non-competition, non-solicitation, and similar

restrictive agreements; (4) restricting access to its computer network and system through a variety of IT  measures, including password protection; and (5) utilizing available measures to remind employees (and their potential new employers, when possible) of their obligations to Cleveland and taking necessary steps to enforce those agreements in court, when necessary.

70.      As discussed at length herein and as evidenced by the exhibits hereto, Cleveland did, indeed, enter into the Agreement, which contains restrictive covenants and mandates the protection of confidential, proprietary, and trade secret information, with Defendant Mahan. Cleveland enters into similar agreements with its other employees who have access to Cleveland's confidential, proprietary, and trade secret information.

71.      Further, on February 6, 2020, Defendant Mahan acknowledged receipt of Cleveland's Code of Conduct, which reaffirmed her obligations under the Agreement. *See* Ex. 2.

72.      Cleveland's trade secret, confidential, and/or proprietary information is among its most valuable assets, provides Cleveland with a competitive advantage, would be very valuable to a competitor, and is deserving of trade secret protection under the law.

73.      Due to her role at Cleveland, Cleveland entrusted Mahan with extensive, if not unlimited, access to Cleveland's confidential information in the course of her employment, including, without limitation, information related to Cleveland's customers, clients, products, pricing, underwriting, claims, strategic plans, business plans, marketing plans, claims, forecasts, and other sensitive, proprietary, confidential, and/or trade secret data and information.

74.      Cleveland has never authorized Mahan to retain, use, or disclose its confidential, proprietary, or trade secret information outside the scope of her employment, for her own benefit, or for the benefit of a competitor, all of which is prohibited conduct under the Agreement. *Id.* at ¶¶ 6-7.

75.     As discussed herein, Mahan improperly accessed Cleverland's trade secret, confidential, and proprietary information in the hours before she resigned and, upon information and belief, exploited a since-patched vulnerability in Cleverland's systems to export Cleverland's trade secret, confidential, and proprietary information through her personal Gmail account before resigning.

76.     Mahan plainly violated the restrictive covenants contained within the Agreement by accepting a nearly identical position with one of Cleverland's direct competitors and will inevitably use, disclose, or otherwise misappropriate Cleverland's confidential, proprietary, and/or trade secret information, as described above, in the course of her employment with Fetch for Fetch's benefit and to Cleverland's detriment.

77.     Without question, Defendant Mahan is in possession of a wide range of Cleverland's confidential, proprietary, and trade secret information and will make use of that information, as well as the relationships that she developed with Cleverland's customers and clients, while performing an identical or near identical role for Fetch, who directly competes with Cleverland and sells the exact same sort of insurance policies in the State of Ohio that Cleverland sells there.

78.     Simply stated, this is exactly the sort of behavior that Cleverland sought to prevent when it entered into the Agreement with Mahan and adopted policies and procedures to ensure the safeguarding and proper use of Cleverland's confidential, proprietary, and/or trade secret information.

79.     Further, Fetch has direct knowledge that Defendant Mahan is bound by the restrictive covenants contained in the Agreement, and that Defendant Mahan will violate the Agreement if she takes a position with Fetch.

80. Nonetheless, Fetch has decided to knowingly aid and abet Defendant Mahan's breach of the Agreement and her other obligations to Cleverland and has decided to hire Defendant Mahan notwithstanding her obligations under the Agreement, specifically to obtain a competitive advantage over Cleverland and has done so without justification. *See* Ex. 10.

**Cleverland Will Suffer Irreparable Harm as A Result of Defendants' Actual and/or Threatened Unlawful Conduct and Requires Injunctive Relief.**

81. As a direct and proximate result of Defendants' actual, threatened, and imminent conduct, Cleverland has suffered, and will continue to suffer, significant irreparable harm, as well as incalculable economic injury and loss, and the likely loss of customers and loss of goodwill.

82. Indeed, the ongoing and threatening nature of Defendants' unlawful actions necessitates judicial intervention in the form of an immediate injunction to: (a) preclude Defendants from improperly retaining, using, and/or disclosing Cleverland confidential information, for their own benefit, or the benefit of others; (b) preclude Mahan from competing against Cleverland in her position with Fetch; (c) preclude Mahan from soliciting and accepting business from Cleverland's customers or prospects whose information was improperly misappropriated and/or whose business was improperly diverted to Fetch; and (d) preclude Fetch from interfering with Mahan's Agreement obligations.

83. Further, in light of the likely significant financial losses incurred by virtue of Defendants' actions (which are incalculable at this time), Cleverland is entitled to all remedies available under law and equity, including, but not limited to compensatory damages, punitive damages, statutory damages, costs of suit, and attorneys' fees in an amount to be proved at trial, as well as any other remedies the Court deems appropriate.

84. To be sure, Defendants are on notice of the ongoing and irreparable harm to Cleverland resulting from Defendants' activity.

85.     Among other notice, Cleverland sent correspondence to Mahan and Fetch, reminding and/or informing them both of Mahan's obligations under the Agreement and that her employment with Fetch would constitute a breach of said Agreement. *See* Exs. 7, 8.

86.     Defendants refused to cease and desist their wrongful behavior in response to those demands.

**Fetch's Prior Counsel Has Recognized And Admitted That
the Agreement Prohibits Mahan From Working for Fetch**

87.     On July 21, 2023, after Counsel for Cleverland sent letters to Mahan and Fetch on July 13th and 17th respectively, the undersigned received an email from Debra S. Friedman, Esq., of the law firm, Cozen O'Connor, identifying herself as counsel for Mahan and Fetch.

88.     Counsel for Cleverland notified Ms. Friedman of a conflict in that Cleverland is owned by NSM Insurance Group ("NSM"), and Cozen O'Connor represents NSM in several open matters.

89.     By email dated July 23, Ms. Friedman requested that "Embrace hold off on filing any proceeding while the parties try to resolve this matter" and recognized that there may be a conflict that would preclude Cozen O'Connor's continued representation.

90.     On July 24, despite Cozen O'Connor being aware that Fox Rothschild LLP was representing Cleverland in this matter, Cozen O'Connor contacted NSM's President, William McKernan, by email and requested that NSM waive the conflict to allow Cozen O'Connor to represent Fetch and Mahan in this litigation.  A true and correct copy of the email is attached hereto as Exhibit 11.

91.     The July 24 email to McKernan included internal correspondence between and among Cozen O'Connor attorneys about the merits of this case and the enforceability of the restrictive covenants signed by Mahan.  *Id.*

17

92.     In the first email in the chain, sent on July 24, 2023 at 12:02 p.m., Fetch's counsel stated, in no uncertain terms, that "Our client Fetch, Inc., a pet insurance company, hired Jennifer Mahan, a former management employee of Cleveland Holdings, LLC d/b/a Embrace Pet Insurance. **Jennifer has a restrictive covenants agreement that prohibits her from working for Fetch and other specific competitors."** *Id.* (emphasis added)

93.     Despite this, and with full knowledge of the terms of Mahan's restrictive covenants Agreement, Fetch hired Mahan anyway in blatant violation of the law.

94.     At approximately 2:00 p.m. on July 24, 2023, the undersigned counsel notified Ms. Friedman that he spoke to his client and NSM would not waive the conflict.

95.     By email dated July 25, 2023, Ms. Friedman, notified the undersigned that Cozen O'Connor was going to decline the representation based upon the conflict.

### COUNT I
### BREACH OF CONTRACT
### (AGAINST DEFENDANT MAHAN)

96.     Cleverland re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

97.     Mahan was a signatory to a valid and enforceable Agreement with Cleverland. This Agreement precludes Mahan from, among other things:

      a.   Working for Fetch;

      b.   Using or disclosing Cleverland's confidential information;

      c.   Competing against Cleverland; and

      d.   Soliciting Cleverland's customers.

*See generally,* Ex. 1.

98.    The Agreement specifically provides that Defendant Mahan is prohibited from working for Fetch during the year period commencing on the date of Defendant Mahan's last date of employment by Cleverland.  *See,* Ex. 1, ¶6.

99.    The Agreement also specifically provides that Defendant Mahan is prohibited from working for anyone who sells pet insurance within the State of Ohio during the two (2) year period commencing on the date of Defendant Mahan's last date of employment by Cleverland.  *See,* Ex. 1, ¶7.

100.    Fetch is a direct competitor of Cleverland's and sells pet insurance products in the State of Ohio.

101.    In dereliction of her obligations under the Agreement, Defendant Mahan has accepted an offer of employment from Fetch during the Restricted Period.

102.    By virtue of the foregoing actual and threatened conduct, Mahan has knowingly and willfully breached her Agreement with Cleverland and, as a direct and proximate cause of Mahan's knowingly and willful breach of contract, Cleverland has and will continue to suffer great economic injury and loss, all to the direct gain of Mahan and her new employer, Fetch.

103.    Defendant Mahan entered into the Agreement as a condition of her employment with Cleverland and received consideration in exchange for her obligations.

104.    Further, the restrictive covenants contained in the Agreement are reasonably limited in time and geographic scope and are narrowly tailored to serve a legitimate business purpose.

105.    The above-described actual and/or threatened conduct of Mahan is the direct and proximate cause of immediate and irreparable harm to Cleverland.

106.    Mahan's actual and/or threatened actions will continue to cause Cleverland irreparable harm if not enjoined.

WHEREFORE, Cleverland respectfully requests judgment in its favor, and against Mahan, as set forth in its Prayer for Relief.

## COUNT II
### TORTIOUS INTERFERENCE WITH A
### CONTRACTUAL RELATIONSHIP
### (AGAINST DEFENDANT FETCH)

107. Cleverland re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

108. Fetch knowingly and willfully interfered with, and continues to interfere with, the relationship between Cleverland and Mahan by intentionally employing Mahan in a position that Fetch was aware violates the restrictive covenants within Mahan's Agreement with Cleverland.

109. Fetch was and is fully aware that Mahan shares a contractual relationship with Cleverland, and that Cleverland relies upon said relationship for its financial prosperity.

110. At all times material hereto, Fetch was aware that the foregoing actions were in direct violation of the Nondisclosure, Non-Compete, and Inventions Assignment Agreement with Mahan.

111. At all times material, Fetch was aware of — yet disregarded — the contractual obligations owed to Cleverland by Mahan.

112. Fetch has no privilege or justification for inducing Mahan to breach her Agreement.

113. The above-described actual and/or threatened conduct of the Defendants is the direct and proximate cause of immediate and irreparable harm to Cleverland.

114. Further, as a direct and proximate result of Defendants' conduct, Cleverland has suffered and will continue to suffer monetary damages.

115. The Defendants' actual and/or threatened actions will continue to cause Cleverland irreparable harm if not enjoined.

116.    WHEREFORE, Cleverland respectfully requests judgment in its favor, and against Fetch, as set forth in its Prayer for Relief.

### COUNT III
### MISAPPROPRIATION/CONVERSION OF TRADE SECRETS AND/OR CONFIDENTIAL BUSINESS INFORMATION UNDER THE FEDERAL DEFEND TRADE SECRETS ACT (AGAINST ALL DEFENDANTS)

117.    Cleverland re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

118.    Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related  to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C § 1836(b)(1).

119.    The trade secrets at issue necessarily involve products and services used in interstate commerce, as the client lists, underwriting policies, claims histories, claims forecasts, human resources documents, forms, payroll data, purchase histories, sales and marketing forecasts and strategies, and other confidential and proprietary information affect the products and services being offered, and the pricing of said products, to purchasers of pet insurance across the country.

120.    At all times material, Mahan knew, or should have known, that Cleverland's confidential information is deserving of trade secret protection under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*., inasmuch as:

        a.    Cleverland invested substantial resources to create, develop, compile, and maintain this information;

        b.    the information is not known outside of Cleverland;

        c.    Cleverland safeguarded the confidentiality of this information, including but not limited to, requiring its employees to execute confidentiality agreements and other restrictive covenants, and housing such information securely;

d.      the information cannot be replicated, compiled, or recreated by a competitor without substantial time, effort, and expense; and

e.      Cleverland's confidential, proprietary, and trade secret information is of significant value to Cleverland and is extremely important in the conduct of its business, and would be extremely valuable to Fetch, a direct competitor.

121.    Cleverland disclosed its confidential information to Mahan while she was in a position of trust and confidence and under circumstances that make it inequitable and unjust for her to have misappropriated the materials and to be using them for her own benefit and for the benefit of Fetch.

122.    Further, on July 12, 2023, Mahan accessed a wide range of files and folders containing Cleverland's trade secret, confidential, and proprietary data before resigning her position at Cleverland, while, at the same time, exploiting a security vulnerability in Cleverland's network to access her personal Gmail account, which, upon information and belief, she then used to export Cleverland's trade secret, confidential, and proprietary data from Cleverland's network.

123.    By copying, taking, using, and/or disclosing Cleverland's confidential information, or intending to do same in the immediate future, Mahan has misappropriated Cleverland's trade secrets in violation of the Defend Trade Secrets Act.

124.    The trade secrets which Mahan misappropriated for the benefit of Fetch and for the advancement of her own career relate to a product or service used in, or intended for use in, interstate commerce.

125.    The Defend Trade Secrets Act provides for injunctive relief in the case of an "actual or threatened" misappropriation of a trade secret.

126.     Mahan's actual and/or threatened actions in converting and misappropriating Cleverland's confidential, proprietary, and trade secret information for her own gain was willful, wanton, and malicious, and was taken with reckless disregard for the rights of Cleverland.

127.     In the alternative, if the finder of fact determines Cleverland's confidential and proprietary information does not constitute trade secrets within the meaning of the DTSA, Mahan is nonetheless liable for the wrongful conversion of such confidential and proprietary materials.

128.     The above-described actual and/or threatened conduct of Mahan is the direct and proximate cause of immediate and irreparable harm to Cleverland.

129.     Mahan's actual and/or threatened actions will continue to cause Cleverland irreparable harm if not enjoined.

130.     Fetch is aware of the protections employed by Cleverland, including the Agreement signed between Cleverland and Mahan, and, nonetheless, hired and employed Mahan to gain access to said confidential information and trade secrets.

131.     WHEREFORE, Cleverland respectfully requests judgment in its favor, and against Defendants, as set forth in its Prayer for Relief.

### COUNT IV
### MISAPPROPRIATION/CONVERSION OF TRADE SECRETS AND/OR CONFIDENTIAL BUSINESS INFORMATION UNDER THE OHIO UNIFORM TRADE SECRETS ACT, O.R.C. § 1333.61, *ET SEQ.* (AGAINST ALL DEFENDANTS)

132.     Cleverland re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

133.     Under the Ohio Uniform Trade Secrets Act ("OUTSA"), §1333.61, *et seq.,* the confidential and proprietary information for which Defendant Mahan accessed and possesses, and for which Defendant Fetch has benefitted or will benefit, is entitled to protection.

134.   The OUTSA protects the whole or any portion or phase of any method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that (1) has independent economic value and is not generally known or readily ascertainable by proper means, and (2) is the subject of efforts to maintain its secrecy.  O.R.C. §1333.61(D).

135.   At all times material, Mahan knew, or should have known, that Cleverland's confidential information is deserving of trade secret protection under the OUTSA, inasmuch as:

      a.  Cleverland invested substantial resources to create, develop, compile, and maintain this information;

      b.  the information is not known outside of Cleverland;

      c.  Cleverland safeguarded the confidentiality of this information, including but not limited to, requiring its employees to execute confidentiality agreements and other restrictive covenants, and housing such information securely;

      d.  the information cannot be replicated, compiled, or recreated by a competitor without substantial time, effort, and expense; and

      e.  Cleverland's confidential, proprietary, and trade secret information is of significant value to Cleverland and is extremely important in the conduct of its business, and would be extremely valuable to Fetch, a direct competitor.

136.   Cleverland disclosed its confidential information to Mahan while she was in a position of trust and confidence and under circumstances that make it inequitable and unjust for her to have misappropriated the materials and to be using them for her own benefit and for the benefit of Fetch.

137.   Further, on July 12, 2023, Mahan accessed a wide range of files and folders containing Cleverland's trade secret, confidential, and proprietary data before resigning her

position at Cleverland, while, at the same time, exploiting a security vulnerability in Cleverland's network to access her personal Gmail account, which, upon information and belief, she then used to export Cleverland's trade secret, confidential, and proprietary data from Cleverland's network.

138.    By copying, taking, using, and/or disclosing Cleverland's confidential information, or intending to do same in the immediate future, Mahan has misappropriated Cleverland's trade secrets in violation of the Ohio Trade Secrets Act.

139.    The Ohio Trade Secrets Act provides for injunctive relief in the case of an "actual or threatened" misappropriation of a trade secret. *See* O.R.C. § 1333.62(A).

140.    Mahan's actual and/or threatened actions in converting and misappropriating Cleverland's confidential, proprietary, and trade secret information for her own gain was willful, wanton, and malicious, and was taken with reckless disregard for the rights of Cleverland.

141.    In the alternative, if the finder of fact determines Cleverland's confidential and proprietary information does not constitute trade secrets within the meaning of the OUTSA, Mahan is nonetheless liable for the wrongful conversion of such confidential and proprietary materials. *See*  O.R.C. §1333.61(D).

142.    The above-described actual and/or threatened conduct of Mahan is the direct and proximate cause of immediate and irreparable harm to Cleverland.

143.    Mahan's actual and/or threatened actions will continue to cause Cleverland irreparable harm if not enjoined.

144.    Fetch is aware of the protections employed by Cleverland, including the Agreement signed between Cleverland and Mahan, and, nonetheless, hired and employed Mahan to gain access to said confidential information and trade secrets.

25

145.    In addition, Defendants' misappropriation, acquisition and/or misuses was intentional and malicious and, thereby, Cleverland is entitled to an award of exemplary damages and an attorneys' fees pursuant to O.R.C. § 1333.63.

WHEREFORE, Cleverland respectfully requests judgment in its favor, and against Defendants, as set forth in its Prayer for Relief.

## COUNT V
## CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)

146.    Cleverland re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

147.    Defendants agreed and conspired to engage in unlawful trade practices and unfair competition, all to the detriment of Cleverland. The aforementioned conspiracy was furthered by Defendants' unlawful conduct as described herein.

148.    The above-described actual and/or threatened conduct of the Defendants is the direct and proximate cause of immediate and irreparable harm to Cleverland.

149.    Defendants' actual and/or threatened actions will continue to cause Cleverland irreparable harm if not enjoined.

WHEREFORE, Cleverland respectfully requests judgment in its favor, and against Defendants, as set forth in its Prayer for Relief.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
## (AGAINST MAHAN)

150.    Cleverland re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein

151.    To maintain a claim for breach of a fiduciary duty, the plaintiff must prove: (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and

26

(3) an injury proximately resulting from that failure. *Troja v. Pleatman*, 2016-Ohio-7683, ¶ 8, 65 N.E.3d 809, 812.

152.    As the Director of Claims and Underwriting for Cleverland's pet insurance brand, Embrace Pet Insurance, Mahan owed a fiduciary duty to Embrace and Cleverland.

153.    A breach of this duty exposes the director to liability for damages where the director acted with deliberate intent to cause injury to the Cleverland or recklessly disregarded Cleverland's best interests. *Id.*

154.    By misappropriating Cleverland's trade secret and confidential and propriety information, accepting a position with Cleverland's direct competitor, Fetch, and sharing such information with Fetch for her own benefit and to the detriment of Cleverland, Mahan breached her fiduciary duty owed to Cleverland.

155.    Cleverland invested substantial resources to create, develop, compile, and maintain this information, which is not publicly known nor publicly accessible, and for which Cleverland has sought to safeguard such information.

156.    The above-described actual and/or threatened conduct of Mahan is the direct and proximate cause of damages to Cleverland.

157.    Cleverland has and will continue to suffer damages based upon Mahan's breach of her fiduciary duty to Cleverland.

**COUNT VII**
**PERMANENT INJUNCTIVE RELIEF**
**UNDER OHIO'S DECLARATORY JUDGMENT ACT, O.R.C. CHAPTER 2721**
**(AGAINST ALL DEFENDANTS)**

158.    Cleverland re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

159.    Cleverland seeks permanent injunctive relief because, absent an injunction for the two-year restricted period, Mahan will work for Fetch, Cleverland's direct competitor, and share Cleverland's propriety information and protected trade secrets.

160.    Ohio's Declaratory Judgment Act, O.R.C. Chapter 2721, allows courts to declare the rights or status of parties that arise in particular circumstances, such as under a contract or law, as well as the legal relations between parties. *State v. City of Cincinnati Citizen Complaint Auth*., 2019-Ohio-5349, ¶ 23, 139.

161.    The restrictive covenant within the Agreement between Cleverland and Mahan prevents Mahan from being employed by Cleverland's direct competitors in the pet insurance space, that offer pet insurance in Ohio, for a period of two years.  *See* Agreement, ¶7.

162.    The restrictive covenants within the Agreement are no greater than is required for the protection of Cleverland, do not impose undue hardship on Mahan, and are not injurious to the public.

163.    The restrictive covenants are reasonable and enforceable, as there is nothing preventing Mahan from performing claims and underwriting work for an insurance company that does not provide pet insurance, and the two-year restrictive period is no greater than is required to protect Cleverland.

164.    A permanent injunction preventing Mahan from working for Fetch during the Restricted Period of two years is necessary to prevent irreparable harm to Cleverland and no other adequate remedy at law is available to Cleverland.

WHEREFORE, Cleverland respectfully requests judgment in its favor, and against Defendants, as set forth in its Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Cleverland Holdings, LLC, respectfully requests that, due to the ongoing, and clearly unlawful acts of Defendants, the Court:

a.      Enjoin Mahan from starting to work at Fetch, or continuing to work for Fetch in a position that unlawfully competes against Cleverland in violation of the Agreement until July 29, 2025; AND

b.      Enjoin Defendants, their agents, servants, and all other persons in acting in concert with Defendants from contacting Cleverland's current or former customers or prospective customers, and/or accepting business from Cleverland's current and/or former customers or prospective customers; AND

c.      Compel Defendants to cease and refrain from using any Cleverland's documents, information, data, files, or other materials; AND

d.      Compel Defendants to immediately return to Cleverland all originals and copies of any documents, information, data, files, or other materials, in any form, that Defendants took, copied, caused to be taken or copied, or received from Cleverland; AND

e.      Award Cleverland compensatory damages, punitive damages, and statutory damages resulting from Defendants' conduct, along with an award of attorneys' fees, costs, and any other relief that this Court determines is necessary, just, and/or appropriate.

Respectfully submitted:

**FOX ROTHSCHILD LLP**

By: /s/ Colin D. Dougherty
Colin D. Dougherty
W. Christian Moffitt (*pro hac vice forthcoming*)
Samuel Haaz (*pro hac vice forthcoming*)
980 Jolly Road, Suite 110
Blue Bell, PA 19422-3001
Tel: (610) 397-6500
Fax: (610) 397-0450

cdougherty@foxrothschild.com
cmoffitt@foxrothschild.com
shaaz@foxrothschild.com

Dated:  August 11, 2023

**VERIFICATION**

I, Brian Macias, in my capacity as the President of Cleverland Holdings, LLC, hereby certify that the facts set forth in the foregoing document are based upon information which I have furnished to counsel, as well as upon information which has been gathered by counsel and/or others acting on behalf Cleverland Holdings, LLC.  The language in the document is that of counsel and not my own. I have read the document, and to the extent it is based upon information that I have given to counsel, it is true and correct to the best of my knowledge, information, and belief. I hereby acknowledge that the facts set forth in the aforesaid document are made subject to the penalties of 28 U.S. Code § 1746, relating to unsworn falsification to authorities.

BRIAN MACIAS