**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CLEVERLAND HOLDINGS, LLC d/b/a EMBRACE INSURANCE AGENCY, LLC, | ) ) ) | CASE NO. 1:23-cv-01571-DCN |
| Plaintiff, | ) ) | U.S. DISTRICT JUDGE DONALD C. NUGENT |
| v. | ) ) ) | U.S. MAGISTRATE JUDGE JENNIFER DOWDELL ARMSTRONG |
| JENNIFER MAHAN, a/k/a JENNA MAHAN and FETCH INSURANCE SERVICES, INC., | ) ) ) | **REPORT AND RECOMMENDATION** |
| Defendants, | | |

## I.     INTRODUCTION

Plaintiff Cleverland Holdings, LLC, d/b/a Embrace Insurance Agency, LLC ("Plaintiff") filed its Complaint for injunctive relief against its former employee, Defendant Jennifer Mahan ("Ms. Mahan"), and Mahan's current employer, Defendant Fetch Insurance Services, Inc. ("Fetch") (collectively "Defendants"). (ECF Doc. 1.) The Complaint asserts the following counts: (1) breach of contract against Ms. Mahan; (2) tortious interference with a contractual relationship against Fetch; (3) misappropriation of trade secrets, in violation of the Defend Trade Secrets Act, against Defendants; (4) misappropriation of trade secrets, in violation of the Ohio Uniform Trade Secrets Act, against Defendants; and (5) civil conspiracy against Defendants. (*Id.*) Plaintiff filed a motion for a temporary restraining order and preliminary injunction. (ECF Doc. 4.)

This motion was referred to me by U.S. District Judge Donald C. Nugent for the preparation of a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF Doc. 20.) I conducted a hearing on Plaintiff's motion on September 25, 2023. For the following reasons, I

1

RECOMMEND that Court **DENY** Plaintiff's motion for a temporary restraining order and preliminary injunction.

## II.     FACTUAL BACKGROUND

Ms. Mahan is a former employee of Plaintiff. (Compl. ¶ 21.) Plaintiff is a nationwide provider of "personalized, affordable and easy-to-use pet health insurance for dogs and cats." (Compl. ¶ 12.) Ms. Mahan worked for Plaintiff from 2011 until July 12, 2023. (ECF Doc 11-1, Declaration of Jennifer Mahan ("Mahan Decl.") ¶ 2.)

Ms. Mahan's most recent role with Plaintiff was Director of Claims and Underwriting. (Compl. ¶21.) According to Brian Macias, Plaintiff's President, Ms. Mahan's responsibilities included the following: (1) managing the claims department, developing and implementing policies and procedures to ensure compliance with regulatory requirements and industry standards; (2) overseeing the underwriting department; (3) monitoring and analyzing claims data to identify trends and opportunities for process improvements; (4) working with marketing and sales teams to develop and implement marketing strategies to drive new business and retain existing customers; (5) participating in industry conferences and events, as Plaintiff's representative, to stay current on trends and emerging issues in pet insurance; and (6) "driv[ing] innovation within the claims space and develop automation solutions to improve operational efficiencies." (ECF Doc. 1-10, Declaration of Brian Macias ("Macias Decl.") ¶ 5.) Plaintiff alleges that, during the course of Ms. Mahan's employment, she "gained knowledge of [Plaintiff's] confidential information and trade secrets, including pricing, claims and underwriting information, client lists and contact information, proprietary policy forms, ISO rating systems, underwriting guidelines, strategic plans, and marketing strategies and developed relationships with many of [Plaintiff's] actual and potential clients." (Compl. ¶ 44.)

Ms. Mahan signed a Nondisclosure, Non-Competition, and Invention Assignment Agreements when she was hired in 2011. (ECF Doc. 1-2 ("Agreement").). In relevant part, Ms. Mahan agreed to never disclose Plaintiff's confidential information to anyone for any purpose upon termination of her employment. (Agreement ¶ 2.) Ms. Mahan further agreed that, for a one-year period following her release or resignation, she would not become employed by or perform professional services of the type she performed for Plaintiff to certain competitors, including Fetch (formerly known as PetPlan). (*Id.* ¶ 6.)

The Agreement also provided that, for a two-year period following her resignation, Ms. Mahan would not: (a) become employed by certain competitors, including Fetch; (b) solicit, encourage, or assist any of Plaintiff's clients or potential clients to purchase similar services from certain competitors; (c) solicit, encourage, or assist any client, potential client, business partner or employee of Plaintiff to reduce or end their professional relationship with Plaintiff; (d) accept competing business from any client or potential client; (e) solicit, encourage, or assist any of Plaintiff's employees to begin a professional relationship with certain competitors; and (f) accept, on behalf of certain competitors that offer competing services in Ohio, the employment or other professional services of any of Plaintiff's employees during the preceding one-year period. (Agreement ¶ 7.)

In her declaration, Ms. Mahan asserts that for several years she was unhappy working for Plaintiff due to "decreasing and at-times non-existent bonuses, unfair compensation in comparison to [her] subordinates, loss of responsibility, and not receiving new types of projects that would allow [her] to grow in [her] position." (Mahan Decl. ¶ 3.) She maintains that an allegedly rude, disparaging e-mail from Plaintiff's former Chief Information Security Officer was "ultimately the last straw" that contributed to her decision to quit. (*Id.* ¶ 4.)

On July 12, 2023, Ms. Mahan logged onto Plaintiff's network using her username and password at 7:58 a.m. (Compl. ¶ 47.) Plaintiff asserts that this login time was unusual because Ms. Mahan had a "known habit" of logging into Plaintiff's system after 9 a.m. on most days. (*Id.*) Ms. Mahan, however, declares she was up early because she was anxious about delivering her resignation to Plaintiff. (Mahan Decl. ¶ 10.)

Plaintiff alleges that Ms. Mahan exploited a "security vulnerability" in Plaintiff's systems that allowed her to access her personal Gmail account from her work laptop using Google Chrome's Incognito browser. (Compl. ¶51; Macias Decl. ¶¶ 33-34.) Plaintiff asserts that Ms. Mahan accessed and/or modified files and folders containing alleged trade secret and confidential information, such as "[Plaintiff's] claims forecasts, claims adjuster meetings, monthly reports, and productivity, claims chat, human resources, payroll, budgets, licensing documents, ongoing complaints, claims communications, meeting files, and professional applications." (Compl. ¶ 48; *see generally* ECF Doc. 1-12.) Plaintiff further states that Ms. Mahan sent 61 files to her recycle bin for deletion. (Compl. ¶ 54; Macias Decl. ¶ 10.) Plaintiff also asserts "upon information and belief" that Ms. Mahan "exported files and/or folders that she accessed on [Plaintiff's] network by sending compressed ZIP files containing [Plaintiff's] property through her personal Gmail account." (Compl. ¶ 52.)

Ms. Mahan, however, responds that her "personal organizational style is somewhat messy," and that she did not think "that the manner [she] had saved items to [Plaintiff's] computer would make sense" to her successor. (Mahan Decl. ¶ 7.) Ms. Mahan stated that she "compiled several standalone documents and saved them together in one folder," and "took some information that had been saved in various places on my computer and saved it together in a OneNote document." (*Id.* ¶ 8-9.) Ms. Mahan also stated that "she deleted several files that were no longer needed because

4

the information was already saved elsewhere or because the information was outdated or irrelevant."  ((*Id.* ¶ 11.) Ms. Mahan further alleged that she sent only one email on her work computer using her personal Gmail account – and that email contained her insurance license information from several states, including her license numbers and their expiration dates. (*Id.* ¶ 11.)  Ms. Mahan states that she used Incognito mode because the e-mail contained personal information, such as her license information and social security number. (*Id.* ¶ 14.)  Ms. Mahan maintains that she used Incognito mode in the past whenever she handled personal matters on her work computer. (*Id.* ¶ 15.)  Ms. Mahan also asserts that she did not compress any documents into a ZIP file to send to herself or anyone else, and in fact that she does know how to do so. (*Id.* ¶ 17.)

Plaintiff hired a forensic expert, Ernesto Espiritu, Jr., to conduct a forensic investigation of Ms. Mahan's work laptop computer. (ECF Doc. 1-14 ("Espiritu Declaration"), ¶¶ 3-5.) Mr. Espiritu was unable to determine whether Ms. Mahan actually transferred any files through G-mail or a third-party platform "due to the amount of time that had elapsed and the use of Incognito mode." (Espiritu Decl. ¶ 14.)

Later that day on July 12, 2023, Ms. Mahan had a videoconference with Mr. Macias and informed him that she was resigning from her position and had accepted a job at Fetch. (Compl. ¶55.) Ms. Mahan states that Mr. Macias "wished [her] well and explained that Plaintiff would like [her] to work through [her] final two weeks and help transition [her] projects to others." (Mahan Decl. ¶ 20.) Following this videoconference, Ms. Mahan sent Mr. Macias an e-mail containing her two weeks' notice of resignation from her position as Plaintiff's Director of Claims and Underwriting. (Compl. ¶ 2; ECF Doc. 1-6.)

On July 13, 2023, Ms. Mahan declares she worked for Plaintiff for "most of the day." (Mahan Decl. ¶ 21.) But she says she "was abruptly told that [she] needed to leave immediately"

and was escorted out of Plaintiff's building. (*Id.*). That same day, Plaintiff wrote to Ms. Mahan and advised her of her obligations under the Agreement to Plaintiff, as well as Plaintiff's intent to enforce those obligations if she attempted to work with Fetch. (Compl. ¶ 60; ECF Doc. 1-7.)

On July 15, 2023, Mr. Macias sent an e-mail to an underwriting partner. (Hearing Tr. 164:23-25; 165:1.) Mr. Macias stated that Ms. Mahan's successor, Ms. Rachel Hinder, was "actually the driver behind the claims business, its growth, scale, and tech." (Hearing Tr. 165:6-7.) Ms. Macias described Ms. Mahan's resignation as a blessing in disguise. (*See* Hearing Tr. 165:10-13.)

Mr. Macias also sent the following e-mail to Plaintiff's leadership team informing them of Ms. Mahan's resignation:

> Accepted Jenna Mahan's resignation this week and promptly promoted Rachel Hinder. This is a great example of having identified a successor and being ready to move quickly. The team is enthusiastic about Rachel's greater role in the org and her transition to the senior leadership team will be a smooth one given her active and ongoing partnership with most of them. We expect very little disruption to the day-to-day and ongoing claims project.

(Hearing Tr. 166:14-22.)

 On July 17, 2023, Plaintiff's counsel sent Fetch written notice of Ms. Mahan's contractual obligations under the Agreement and informed Fetch that Plaintiff intended to enforce those obligations if Fetch proceeded with its plan to hire Ms. Mahan. (Compl. ¶ 61; ECF Doc. 1-8.)

Ms. Mahan's new position with Fetch is Senior Director of Claims. (Mahan Decl. ¶ 23). Fetch is a specialty insurance company "engaged in the business of pet veterinary insurance for dogs and cats" in all 50 states. (Compl. ¶¶ 14, 41.) Prior to 2021, Fetch was known as "PetPlan," but it subsequently changed its name and rebranded itself as "Fetch by the Dodo." (Compl. ¶ 15 (citing ECF Doc. 1-3).) Ms. Mahan began working for Fetch on August 14, 2023. (Mahan Decl. ¶ 22.) She describes her new role at Fetch as a "supervisory position" where her primary

responsibility is to oversee the work and budget of a 50-person claims team. (*Id.*) Ms. Mahan declares that she does not have any use for and will not divulge Plaintiff's confidential information in her new position. (Mahan Decl. ¶¶ 24-25.)

In supplemental briefing, Ms. Mahan points to an internal text message exchange on July 24, 2023, between certain Plaintiff's employees reporting that Plaintiff's IT team did a full audit of Ms. Mahan's work laptop and, outside of updating her resume, "they didn't find anything." (ECF Doc. 25-1.) The inbox was not scrubbed, she didn't "delete a bunch of stuff," and there were no "large downloads." (*Id.*)

### III. STANDARD OF REVIEW

An injunction is an "extraordinary remedy" only available when the circumstances "clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The party seeking an injunction must establish its case by clear and convincing evidence. *Invacare Corp. v. Nordquist*, No. 1:18-CV-62, 2018 WL 2454523, at *3 (N.D. Ohio June 1, 2018); *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331, 1998, WL 152951, at *3 (6th Cir. 1998). "The same standard generally applies to temporary restraining orders and preliminary injunctions." *Perry v. May*, No. 3:22 CV 688, 2023 WL 406054, at * (N.D. Ohio Jan. 25, 2023) (citations omitted)).

When considering a motion for injunctive relief under Rule 65 of the Federal Rules of Civil, a court must consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable injury absent injunction; (3) whether a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction. *Flight Options, LLC v. Int'l Bhd. Of Teamsters, Local 1108*, 863 F.3d 529, 539-40 (6th Cir. 2017). These factors should be balanced against each other but are

"not prerequisities that must be met." *In Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985); *see also Overstreet*, 305 F.3d at 573. Although no single factor is determinative, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000); *Transtar Industries, LLC v. Lester*, No. 1:19cv1230, 2019 WL 3458456, at *4 (N.D. Ohio July 31, 2019).

## IV.     ANALYSIS

### A.   <u>Likelihood of Success on the Merits</u>

As set forth above, Plaintiff asserts claims for (1) breach of contract against Ms. Mahan; (2) tortious interference with contractual relationships against Fetch; (3) misappropriation of trade secrets under the Defend Trade Secrets Act and Ohio Uniform Trade Secrets Act against Defendants; and (4) civil conspiracy against Defendants. For the following reasons, Plaintiff fails to demonstrate a likelihood of success on the merits of any of these claims.

#### 1.   *Breach of Contract*

Plaintiff first alleges that Ms. Mahan breached non-competition provisions contained within her Agreement with Plaintiff by working for Fetch. (ECF Doc. 4-2, PageID#130-34.) Plaintiff further asserts that these provisions are reasonable because Plaintiff has a legitimate business interest of protecting trade secrets or confidential/proprietary information; the length of the restrictive period is reasonable; and the provisions only prohibit Ms. Mahan from working from companies that offer pet insurance in Ohio. (*Id.*).

Defendants counter that the noncompete restrictions of the Agreement are unreasonable and therefore unenforceable because it will not further a legitimate business interest of Plaintiff. (ECF Doc. 11, PageID#1844.) Specifically, Defendants contend that Ms. Mahan's role at Fetch is not customer-facing, and she will have no opportunity to solicit Plaintiff's former customers. (*Id.*)

Further, as Senior Director of Claims, Ms. Mahan is "primarily responsible for overseeing and managing the work and budget of other Fetch Employees," and "this managerial role will provide no reason, motive, or opportunity for her to divulge" any of Plaintiff's confidential information. (*Id.*) Thus, Defendants argue that "the only business interests that Ohio recognizes as fundamental enough to justify preventing an employee from working are not implicated here." (*Id.*)

To succeed on a breach of contract claim, a plaintiff must demonstrate: (1) the existence of a contract; (2) that Plaintiff fulfilled its contractual obligations; (3) defendant breached his/her obligations; and (4) resulting damages. *CNG Fin. Corp. v. Brichler*, No. 1:21-cv-460, 2021 WL 4189577, at *5 (S.D. Ohio Sept. 14, 2021) (citing *Langan v. Carlton Gardens Co.*, 916 N.E.2d 1079, 1087 (Ohio Ct. App. 2009)).

Defendants do not materially challenge that Ms. Mahan's employment with Fetch violates her non-competition agreement based on its own terms. Rather, Defendants challenge the reasonableness of the enforcement of Ms. Mahan's restrictive covenant.

Ohio courts disfavor restrictive covenants, which are "scrutinized carefully to ensure their intended effect is not to prevent competition, but to protect a legitimate business interest." *Invacare Corp.*, 2018 WL 2454523, at *4 (citing *MP TotalCare Servs., Inc. v. Mattimoe*, 648 F.Supp.2d 956, 962 (N.D. Ohio 2009)); *Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-284, 2016 WL 4523104, at *10 (N.D. Ohio Aug. 30, 2016)). Reasonable non-compete agreements are enforced, and unreasonable non-compete agreements are enforced, to the extent necessary to protect an employer's legitimate interest. *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 275 (Ohio Ct. App. 2000). The Ohio Supreme Court has held that "[a] covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship

on the employee, and is not injurious to the public." *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975); *see also PolyOne Corp. v. Kutka*, 67 F.Supp.3d 863, 869-70 (N.D. Ohio 2014) (citing *Raimonde*, 325 N.E.2d at 547)).

In assessing the validity of a non-compete, the Ohio Supreme Court has instructed that "each case must be decided on its own facts." *Raimonde*, 325 N.E.2d at 547. The Sixth Circuit recognized that courts should consider the following "absence or presence of a long list of factors" in determining the reasonableness of a non-competition covenant: (1) whether the covenant imposes temporal and spatial limitations; (2) whether the employee had contact with customers; (3) whether the employee possess confidential information or trade secrets; (4) whether covenant bars only unfair competition; (5) whether the covenant stifles the employee's inherent skill and experience; (6) whether the benefit to the employer is disproportionate to the employee's detriment; (7) whether the covenant destroys the employee's sole means of support; (8) whether the employee's talent was developed during the employment; and (9) whether the forbidden employment is merely incidental to the main employment. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (citing *Raimonde*, 325 N.E.2d at 544)). If a non-compete agreement is unreasonable, courts may modify the terms to create a reasonable covenant between the parties. *Rogers v. Runfola & Assoc. Inc.*¸ 565 N.E.2d 540, 544 (Ohio Sup. Ct. 1991).

Each of the *Raimonde* factors will be discussed in turn below. Based upon the evidence presented, Plaintiff failed to carry its burden of showing that the non-compete agreement is reasonable and enforceable in scope.

### a. Time and Space Limitations

The non-competition agreement here has reasonable time and space limitations. Courts within Ohio have held that non-compete agreements with two-year durations are reasonable.

*Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991-92 (6th Cir. 2007) (affirming district court decision that a covenant is reasonable for at least two years); *Handel's Enterprises, Inc. v. Schulenburg*, No. 4:18CV508, 2018 WL 3077756, at *5 (N.D. Ohio June 22, 2018) (finding two-year non-compete agreement reasonable and enforceable); *Life Line Screening of Am., Ltd. v. Calger*, 145 Ohio Misc.2d 6, 19, 881 N.E.2d 932, 942 (2006) (observing that "[n]umerous Ohio decisions have upheld contracts calling for two-year periods or longer").

Further, the scope of the restrictive covenant here is reasonable. The non-competition provision prohibits Ms. Mahan from owning or becoming employed by businesses and persons who sell pet insurance and other products and services similar to those offered by Plaintiff in Ohio. (*See id.* ¶¶ 6,7, 14.) And Fetch (formerly knowing as PetPlan) is specifically listed as one of those prohibited employers.  (*Id.* ¶ 14.) Thus, this factor weighs in favor of Plaintiff.

### b.  Contact with Customers

The evidence presented shows that Ms. Mahan had limited contact with customers and was not in a sales or customer-facing position. While Mr. Macias stated that Ms. Mahan "developed relationships with many of [Plaintiff's] actual and potential clients" (Macias Decl. ¶6), this appears to be an exaggeration. Rather, the evidence reflects that Ms. Mahan only had direct contact with Plaintiff's customers when there was a customer problem or complaint that was escalated to her. (ECF Doc. 25-2, Mahan Supplemental Declaration ("Mahan Supplemental Decl."), ¶4(h).) Nor does Plaintiff establish that Ms. Mahan's current position at Fetch involves soliciting customers or employees. Accordingly, this factor weighs in favor of Ms. Mahan.

### c.  Confidential Information and Trade Secrets

Mr. Macias stated that Plaintiff's trade secrets include "pricing, claims, and underwriting information, client lists and contact information, proprietary policy forms, ISO rating systems,

underwriting guidelines, strategic plans, and marketing strategies." (Macias Decl. ¶6; *see also* ECF Doc. 4-2, PageID#42.) But the evidence demonstrates that almost *all* of this information is publicly available. For example, it is undisputed that Plaintiff's pricing, claims, and underwriting information; policy forms; ISO rating systems; and underwriting guidelines are publicly filed with state departments of insurance. (ECF Doc. 25-2, PageID#295-376.)[1]

Plaintiff also does not establish a compelling argument that its client lists and client contact information is protected, confidential information. It is undisputed that Ms. Mahan may have *some* limited knowledge of Plaintiff's numerous customers. But as discussed above, Ms. Mahan was not in a customer-facing role when she was employed by Plaintiff. The direct contact with customers that she had was when irate customers escalated their issues through several channels. (Mahan Supplemental Decl. ¶4(h); Hearing Tr. 45:2-4.). Further, given the sheer size of Plaintiff's customer base – over 600,000 customers – it is questionable how much of this knowledge Ms. Mahan really could have retained. (Mahan Supplemental Decl. ¶4(d); *see* Hearing Tr. 43:12.) Significantly, Plaintiff does not dispute Ms. Mahan's assertion that it would be "poor business practice" to solicit Plaintiff's current customers because these customers have no incentive to switch pet insurance providers.  (Mahan Suppl. Decl. ¶4(d)). That is because a "pet's health conditions that were covered by an original insurance policy would not be covered if the pet owner switched providers, leading to unhappy customers." (*Id.*) Thus, "pet insurance companies typically only seek out new customers, meaning a young pet or a pet that has never previously had a policy." (*Id.*) And Plaintiff fails to establish that Ms. Mahan even took this information upon leaving employment with Plaintiff. Finally, Plaintiff does not convincingly establish that disclosure of this

---

[1] Plaintiff's underwriter, American Modern Home Insurance Company, is required to maintain a public record of much of this information. This information is readily searchable online through the National Association of Insurance Commissioners' website. *See* National Association of Insurance Commissioners, *SERRF Filing Access*, https://filingaccess.serff.com/sfa/home/OH (last accessed Oct. 3, 2023).

information would be inevitable in her current position because Ms. Mahan's current position involves managing employees, *not* soliciting customers.

Plaintiff also failed to show with clear and convincing evidence that Plaintiff's unidentified "strategic plans" and "marketing strategies" are protected, confidential information. That is because Plaintiff has "eschewed any explanation of what this information actually is and why it is confidential." *CNG Fin. Corp.,* 2021 WL 4189577, at *8 (rejecting plaintiff's argument that the defendant, a former employee, "was privy to confidential and proprietary information regarding [plaintiff] business and operations, including with respect to [plaintiff's] financial information, marketing strategies, growth metrics and operational information, and including business performance and current and future initiatives" established confidential information and trade secrets). And even if Plaintiff had made such a showing, it still failed to demonstrate by clear and convincing evidence that Ms. Mahan would inevitably disclose any marketing material in light of her supervisory role as Director of Claims at Fetch. (Hearing Tr. 207:1-2.)

Significantly, Plaintiff's definition of confidential, trade secret information became a moving target during the preliminary injunction hearing. After lengthy cross-examination, Mr. Macias attempted to broadly define the confidential information at issue as Ms. Mahan's knowledge of Plaintiff's "secret sauce," *i.e.*, the way Plaintiff operates its business and the knowledge of how Plaintiff processes its claim and manages its employees. (Hearing Tr. 134:11-22.) In essence, Plaintiff contends that Ms. Mahan's 12-year employment as Plaintiff's Director of Underwriting and Claims allowed her access to confidential business information, and the noncompete agreement is necessary to protect that information.

First, Plaintiff puts forth no evidence—either circumstantial or direct—of the disclosure of its confidential information. *CNG Fin. Corp.*, 2021 WL 4189577, at *7 (finding plaintiff failed to

establish the *Raimonde* "confidential information and trade secret" factor in part because "there is no evidence, circumstantial or direct, of disclosure of confidential information."). Plaintiff alleges that on July 12, 2023, Ms. Mahan logged in at an "abnormal time" – 7:58 a.m. – to access her personal Gmail account through Plaintiff's network. (ECF Doc. 4-2, PageID#142.) And the Complaint further alleges that while Ms. Mahan had her personal email account open, she accessed files containing allegedly confidential information and trade secrets and "upon information and belief" downloaded those files and sent them to herself for personal use. (*Id.*).

Yet Plaintiff's forensic expert (Espiritu Decl. ¶14) and Mr. Macias (*see* Hearing Tr. 155:6-9) were unable to pinpoint and state with any certainty that Ms. Mahan had taken any confidential, trade secret information upon her termination of employment. In fact, it is undisputed that Plaintiff's own employees reported on July 24, 2023, that Plaintiff's IT team did a full audit of Ms. Mahan's work laptop and, outside of updating her resume, "they didn't find anything." (ECF Doc. 25-2.)  The inbox was not scrubbed, she didn't "delete a bunch of stuff," and there were no "large downloads."  (*Id.*)  Nor does Plaintiff establish that Ms. Mahan took the alleged proprietary claims processing software upon termination of her employment. *See CNG Fin. Corp.,* 2021 WL 4189577, at *7 ("[Plaintiff] makes no allegation that [Defendant] has taken—in his memory or on an external drive—anything tangible, like [Plaintiff's] middleware or proprietary underwriting components.")

Plaintiff invites me to speculate that Fetch could replicate Plaintiff's 16-year-old custom claims processing software if Fetch asked Ms. Mahan to help head a programming team with an unlimited budget. (*See* Hearing Tr. 225:10-13.) I decline to do so.  There is no evidence demonstrating that Fetch replicated Plaintiff's proprietary software or has plans to do so. In fact,

Ms. Mahan testified that Fetch recently purchased new software and already made changes to its existing infrastructure to accommodate that new software. (Hearing Tr. 233:1-13.)

Next, the evidence demonstrates that Plaintiff's claims processing software and its employee incentive system are based specifically on its existing infrastructure. Plaintiff failed to show that Ms. Mahan's general knowledge of these areas would be valuable to another company such as Fetch, which has its own, completely different infrastructure. *See CNG,* 2021 WL 4189577, at *7 ("[The defendant] and his team developed third-party software integrations based specifically on [plaintiff's] existing infrastructure such that the value of [the defendant's] knowledge to another company with its own infrastructure cannot be assumed.") Indeed, Ms. Mahan testified that Fetch recently purchased and plans to implement an entirely different claims processing program. (Hearing Tr. 233:1-13.) And Fetch's employee incentive program is different from Plaintiff's because it is based on Fetch's own claims processing program. (Hearing Tr. 211:24-25, 212:14-15.)

Finally, "this is prologue to the Court's third issue with the allegedly confidential information [Ms. Mahan] is said to possess: it is not clearly distinguished from [Ms. Mahan's] general skills and knowledge of [her] trade." *CNG Fin. Corp.,* 2021 WL 4189577, at *8 (citing *Jacono v. Invacare Corp.*, 2006-Ohio-1596, 2006 WL 832451, (Ohio Ct. App. 2006)). Significantly, while "[t]he line between general know-how and confidential information may not be a bright one," Plaintiff has the "burden to prove the reasonableness of its Non-Compete as it seeks to have it enforced." *Id.* (noting that the plaintiff failed to direct the court to relevant authority suggesting that knowledge of "how to devise custom solutions to recuring industry problems is 'confidential.'").

As in *CNG Fin. Corp.,* Plaintiff fails to demonstrate that Ms. Mahan's knowledge of Plaintiff's organization and operational management constitutes confidential information. In *Concentrix CVG Customer Mgmt. Grp., Inc. v. Daoust*, No. 1:21-cv-131, 2021 WL 1734284, at *11 (S.D. Ohio May 3, 2021), the plaintiff asserted that its former employee's knowledge of its organization and operational management constitutes confidential information. The *Concentrix* court rejected this argument because, beyond the plaintiff's vague assertion, the record did not establish how the manner the call center organized its team was unique or different from any other business that operates call-centers. *Id.* And the *Concentrix* court found it was persuasive that the defendant worked for a new employer for over four months, "and the record before the Court is silent on any instances of [the defendant] stealing [the plaintiff's] clients, employees, or otherwise using confidential information." *Id.* at *12.

As in *Concentrix,* Plaintiff here fails to offer any clear evidence to demonstrate that how it operates and processes its claim or manages its employees is inherently unique or different from any other business that deals in pet insurance. *See also CNG Fin. Corp.*, 2021 WL 4189577, at *7 (finding no trade secret or confidential information under the *Raimonde* factor because "the gist of [plaintiff's] claims suggests that the label of 'confidentiality' may be stretched to everything within [defendant's] ability—from his application of an iterative process like 'trial and error' to his 'knowledge of how' to create a custom solution for NOAAs."). And as in *Concentrix*, Plaintiff failed to show that Ms. Mahan – who has worked for Fetch since August 14, 2023 – stole any of its clients, employees, or otherwise used confidential information.  Accordingly, this factor weighs in Ms. Mahan's favor.

### d.  Limiting Unfair or Ordinary Competition

This factor considers whether the non-compete agreement prohibits not only unfair competition but also stifles ordinary competition. Under common law, unfair competition usually involves the "subjective intent to injure [another] party's ability to be competitive." *CNG Fin. Corp. v. Brichler,* No. 1:21-cv-460, 2021 WL 4189577, at *8 (S.D. Ohio Sept. 14, 2021) (citing *Am. Chem. Soc. v. Leadscope, Inc.*, 2012-Ohio-4193, § 93, 133 Ohio St. 3d 3666, 392, 978 N.E.2d 832, 835 (Ohio 2012)). "The concept of unfair competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *CNG Fin.,* 2021 WL 4189577, at *8 (citing *Water Mgmt., Inc. v. Stayanchi*, 15 Ohio St. 3d 83, 85, 472 N.E.2d 715, 717 (Ohio 1984).

It is undisputed that the non-compete provision in the Agreement prohibits Ms. Mahan from being employed at Fetch, or even providing services similar to what she performed for Plaintiff to other competitors for a two-year period. (Agreement ¶¶ 7, 14.) But Plaintiff's attempted enforcement of this non-competition agreement appears to be motivated by eliminating ordinary competition, not just unfair competition. Plaintiff here seeks to prevent a good employee from utilizing her general skills and knowledge merely because it might benefit Plaintiff's competitor. Indeed, Mr. Macias admitted that Plaintiff "wouldn't be here if [Plaintiff] thought [Ms. Mahan] was a schlep." (Hearing Tr. 164:2-3.) The non-compete provision in the Agreement would preclude Ms. Mahan from applying her general skills and knowledge – even if did not involve confidential, trade secret information – that she would have obtained during her employment as an insurance professional.   Thus, Plaintiff is "seeking to impact ordinary competition from a competitor, not just unfair competition." *Concentrix,* 2021 WL 1734284, at *13.  Accordingly, this factor weighs in Ms. Mahan's favor.

> **e. Stifle Employee's Inherent Skills/Employees Skills Developed During Employment/Benefit to Employer and Detriment to Employee/Employee's Sole Means of Support**

Ms. Mahan has worked in the pet insurance industry for over 12 years, most recently as Plaintiff's Director of Claims and Underwriting. (Mahan Decl. ¶ 2.) Ms. Mahan's new role at Fetch is Director of Claims. (*Id.* ¶ 23.) Ms. Mahan asserts that her position at Fetch is not customer-facing, and that her primarily responsibility is to oversee the work and budget of a 50-person claims team. (*Id.*) It is unclear whether Ms. Mahan could easily transfer her skillset to a similar role in an insurance sector other than the pet insurance industry (*e.g.*, property, auto, and casualty insurance) that does not compete with Plaintiff. Ms. Mahan admitted at the hearing that she likely could find an employment in another sector of the insurance industry, so she would not be without her sole means of support. (Hearing Tr. 218:9-10.)

However, enforcing Plaintiff's non-compete agreement would be to Ms. Mahan's detriment. Ms. Mahan described the financial hardship she would experience, such as being unable to support her family or pay for her student loans or small farm. (Hearing Tr. 63:8-10; *see* Mahan Decl. ¶ 27.) Ms. Mahan stated at the hearing that automobile or property insurance companies would likely not hire her for a director or managerial role because she lacks specific knowledge on how to adjudicate claims in these sections. (Hearing Tr. 218: 11-14.) Consequently, [Ms. Mahan] "would be disproportionately disadvantaged by enforcing the agreement because [s]he would be required to forego a significant and perhaps unique promotional opportunity." *Convergys Corp. v. Wellman*, No. 1:07-CV-509, 2007 WL 4248202, at *7 (S.D. Ohio Nov. 30, 2007). But "*[i]f* the non-compete was enforceable as written, any detriment to [Ms. Mahan] would be caused by her own breach." *Concentrix,* 2021 WL 1734284, at *13 (emphasis in original) (citing *Avery Dennison Corp v. Kitsonas*, 118 F.Supp.2d 848, 855 (S.D. Ohio Oct. 12, 2000) ("Any harm to

[defendant] would be as a direct result of h[er] own actions" in breaching restrictive covenants in an employment agreement.)).

The record is unclear regarding the derivation of Ms. Mahan's skills in processing pet insurance claims. While Plaintiff highlights that Ms. Mahan had no experience in the pet insurance industry prior to her employment with Plaintiff, Plaintiff failed to demonstrate how it helped develop those skills in light of its own testimony that the development and improvement of its claims process happened through trial and error.  (Hearing Tr. 134:4-7, 225:14-15, 228:17-22.) Further, Ms. Mahan testified that her experience as a veterinary technician provide the crucial background knowledge of veterinary medicine that aided her in processing pet insurance claims. (Hearing Tr. 203:12-14.) This is a point that falls in Ms. Mahan's favor. But when considering this factor as a whole, it weighs slightly in favor of Plaintiff.

### f.   Forbidden Employment Incidental to the Main Employment

The evidence regarding this factor is conflicting. Plaintiff identifies similarities between Ms. Mahan's position, such as managing a team of employees; overseeing aspects related to claims; implementing strategies to enhance employee morale; and improving the productivity and efficiency through claims process optimization. Plaintiff also points out that Ms. Mahan's new employment is in the same industry. However, Defendants also demonstrated that Ms. Mahan's role with Fetch does not include underwriting. Moreover, Ms. Mahan's current role is not a customer-facing position and is confined to managing employees. Ms. Mahan argues that she will only be using her general skills and knowledge to operate in a managerial function. However, because there is some overlap in the Ms. Mahan's former and current roles, this factor falls slightly in favor of Plaintiff.

19

### g.  Summary of Factors

A number of factors weigh in favor of Plaintiff and finding the agreement reasonable: time and spatial limitations; the ability for Ms. Mahan to seek incidental employment at a non-competitor using her general business knowledge; and allowing Plaintiff to enforce a bargained-for non-compete agreement. However, the remaining factors also demonstrate that enjoining Ms. Mahan's employment with Fetch and enforcing the non-compete agreement would be unreasonable. That is because Ms. Mahan only had contact with frustrated customers after they escalated their issues through several levels. And she did not solicit customers for Plaintiff, and it is undisputed that she was never the sole contact for any customer. If the agreement were enforced, Ms. Mahan would experience detriment because she would forego a career advancement opportunity and face economic hardship. The non-compete agreement, if enforced against the use of Ms. Mahan's general business knowledge, eliminates ordinary competition – not just unfair competition. And Plaintiff has not demonstrated that it would suffer prejudice to the extent that Ms. Mahan had knowledge of any of Plaintiff's purported confidential information.

In essence, Plaintiff impermissibly seeks to enforce the non-compete agreement based on Ms. Mahan's general business knowledge that she obtained through a trial-and-error process when she was employed with Plaintiff.  *See CNG Fin. Corp.,* 2021 WL 4189577, at *8; *Concentrix,* 2021 WL 1734284, at *10-17. Thus, considering the foregoing, Plaintiff has not met its heavy burden of showing that its non-compete agreement provision is reasonable enforceable. Accordingly, at this preliminary stage, Plaintiff fails to demonstrate a likelihood of success on the merits on its breach of contract claim.

## 2.  *Tortious Interference with Contractual Relationships*

To establish tortious interference with contractual relationships under Ohio law, a plaintiff must show: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Georgia-Pac. Consumer Products LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012). Because Ohio does not recognize negligent interference with a business relationship, actions must be intentional. *Aetna Cas. & Dur. Co. v. Leahey Const. Co., Inc.*, 22 F.Supp.2d 695, 705 (N.D. Ohio 1998) (citing *Smith v. Ameriflora 1992, Inc.*, 96 Ohio App.3d 179, 186, 644 N.E.2d 1038 (1994); *Burnside v. Leimbach*, 71 Ohio App.3d 399, 404, 594 N.E.2d 60 (1991)).

Plaintiff argues that Fetch tortiously interfered with Plaintiff's contract with Ms. Mahan by hiring her with knowledge that Plaintiff intended to enforce its contractual rights regarding its noncompete provision. (ECF Doc. 4-2, PageID#134-37.) Because the tortious interference claim here is directed solely at Fetch's decision to employ Ms. Mahan, that cannot provide the basis for a tortious interference claim in light of my earlier finding that the noncompete provision is unenforceable. *Total Quality Logistics, LLC v. EDA Logistics, LLC*, --- F. Supp.3d ---, No. 1:21-cv-164, 2023 WL 5057333, at *10 (S.D. Ohio July 31, 2023) ("But the Court has found that provision unenforceable, so it cannot provide the basis for a tortious interference claim.") Thus, Plaintiff does not meet its burden in demonstrating likelihood of success on the merits of its tortious interference with contractual relationships claim. Accordingly, I recommend that the Court deny Plaintiff's motion with respect to this claim.

### 3. *Misappropriation of Trade Secrets*

#### a. **Relevant Legal Standards**

Plaintiff asserts two misappropriation of trade secrets claims against Defendants. First, Plaintiff alleges misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, 1839. To state a colorable DTSA claim for injunctive relief, Plaintiff must demonstrate: (1) the existence of a protectable trade secret; and (2) misappropriation of the trade secret by the defendant. *PPS Serv. Grp., LLC v. Eckert*, No. 1:18CV727, 2019 WL 3927232, at *3 (S.D. Ohio Aug. 20, 2019). Under the DTSA, a "trade secret" is information that (1) the owner has taken reasonable measures to keep secret; and (2) derives independent economic value, actual or potential, from not being generally known to, and not readily ascertainable though proper means by, another person who can obtain economic value from the disclosure or use of the information. *See* 18 U.S.C. § 1839(3).

Misappropriation is shown by:

facts establishing an unconsented disclosure or use of a trade secret by one who used improper means to acquire the secret; or, at the time of the disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret.

*Ford Motor Co. v. Launch Tech Co.*, No. 17-12906, 2018 WL 1089276, at *16 (E.D. Mich. Feb. 26, 2018) (citing 18 U.S.C. § 1839(5)).

Plaintiff also alleges misappropriation of trade secrets in violation of the Ohio Uniform Trade Secrets Act. To prevail, Plaintiff must prove: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *Transtar Indus.*, 2019 WL 3458456, at *1; *see also Duro Corp. v. Canadian Standards Ass'n*, No. 1:17CV1127, 2017 WL 6326862, at *2 (N.D. Ohio Dec. 11, 2017).

Under Ohio law, a "trade secret" is information that: (1) derives its value from being generally not known nor readily ascertainable by others who could derive value from it; and (2) be the subject of reasonable efforts to maintain its secrecy. Ohio Rev. Code § 1333.61(D). The Ohio Supreme Court also adopted six factors for determining whether information constitutes a trade secret: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Metron Nutraceuticals, LLC v. Cook*¸ No. 1:20-cv-01803, 2023 WL 4565987, at * (N.D. Ohio July 18, 2023) (citing *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St.3d 513, 524-25, 1997-Ohio-75, 687 N.E.2d 661 (1997)).

If Plaintiff demonstrates a trade secret, Plaintiff also still carries the burden to demonstrate that misappropriation has occurred or is threatened. Merely stating that the inappropriate use of the information is inevitable is not sufficient. *Premier Dealer Serv., Inc. v. Allegiance Admin'rs, LLC*, No. 2:18CV735, 2018 WL 5801283, at *5 (S.D. Ohio Nov. 6, 2018); *Prosonic Corp. v. Stafford*, 539 F.Supp.2d 999, 1005 (S.D. Ohio 2008) (citing *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F.Supp.2d 1028, 1042-43 (N.D. Ohio 2003), *aff'd*, 113 F. App'x 98 (6th Cir. 2004).

Plaintiff has not carried its heavy burden of showing a likelihood of success on the merits of its trade secret claim.  First, Plaintiff does not produce clear and convincing evidence that its pricing, claims, and underwriting information; policy forms; ISO rating systems; and underwriting guidelines are trade secrets. Indeed, it is undisputed that this information is readily ascertainable

because it is publicly filed. (ECF Doc. 25-2, PageID#295-376); *see also Transtar Industries, LLC v. Lester*, No. 1:19cv1230, 2019 WL 3458456, at *6 (N.D. Ohio July 31, 2019) (finding information regarding potential customers and delivery routes was not confidential, trade secret information because it was "readily ascertainable through publicly available websites such as Google").

Next, Plaintiff has presented no evidence that Defendants have committed an "unauthorized use of a trade secret," or "disclosure or use of a trade secret." Plaintiff alleges "upon information and belief" that Ms. Mahan accessed "at an abnormal time" files containing a "wide variety of Cleveland's trade secret, confidential, and proprietary information," compressed those files into ZIP folders, and sent the information to her personal e-mail account for later use in her employment with Fetch. (ECF Doc. 4-2, PageID#142).

But the evidence show that this allegation is mere speculation. Plaintiff's own forensic expert, Mr. Ernesto Espiritu, Jr., stated that the only facts he could verify are that an account user, "jsm," logged into Ms. Mahan's former computer the morning of July 12, 2023, and accessed, modified, and deleted certain files. (Espiritu Decl. ¶¶ 6-11.) He further admitted:

> I was unable to determine whether the "jsm" user transferred Cleverland files inappropriately via web-based email such as Gmail, or via third-party platform due to the amount of time that had elapsed and the use of Incognito mode.

(*Id.* ¶14.)  And it is undisputed that Plaintiff's own employees reported on July 24, 2023, that Plaintiff's IT team did a full audit of Ms. Mahan's work laptop and, outside of updating her resume, "they didn't find anything."  (ECF Doc. 25-2.)  The inbox was not scrubbed, she didn't "delete a bunch of stuff," and there were no "large downloads."  (*Id.*)

Mr. Macias was also unable to confirm at the hearing that Ms. Mahan took any confidential information (*See* Hearing Tr. 155:6-9.) Rather, Mr. Macias vaguely testified that the alleged

confidential information that Ms. Mahan accessed was "in her brain." (Hearing Tr. 156:20-21.) Yet the record shows that Ms. Mahan sent a single e-mail on July 12, 2023, using her personal email account that contained information related to her adjuster and producer licenses in several states, which was saved to her former work computer. (ECF Doc. 11-1, ¶11 ("Mahan Declaration").)

At the hearing, Plaintiff also asserted that Ms. Mahan's knowledge of Plaintiff's claims process, the processes used to achieve claim processing efficiency, and the knowledge of how to improve employee morale all constituted confidential, trade secret information. In *CNG Fin. Corp.*, 2021 WL 4189577, at *6 (S.D. Ohio Sept. 14, 2021), the defendant former CTO of a consumer financial loan company was involved in the implementation of the plaintiff's third-party loan management software; integration of its third-party platform; implementation of its loan origination services; design and implementation of a proprietary underwriting engine; fraud detection; and regulatory monitoring functionality. The plaintiff asserted confidentiality over the "technology solutions and the processes used to reach them." *Id.* at *7. The *CNG Fin. Corp.* court rejected this claim for three reasons: (1) the plaintiff failed to demonstrate  the "independent economic value" of its alleged trade secret; (2) the plaintiff failed to demonstrate its alleged trade secrets could not be ascertained by "proper means" because the former employee and his team arrived at many of their technology solutions through "trial and error rather than any proprietary design; and (3) the alleged information was not trade secrets because the plaintiff failed to fully distinguish the former employee's general business skills from a trade secret. *CNG,* 2021 WL 4189577, at *11-12.

As in *CNG Fin. Corp.*, Plaintiff here did not establish that its claims software or Ms. Mahan's knowledge of how to improve employee morale would have independent economic value

for Fetch because Fetch's incentive program was based on an entirely different claims process than Plaintiff's. Moreover, as in *CNG Fin. Corp.,* Mr. Macias admitted that Plaintiff's "confidential" process was the result of Ms. Mahan's and other employees' general process of trial and error. (Hearing Tr. 134:4-7) (testifying that Plaintiff "play[ed] the game for 16 years" and learned what works in the claims process through "trial and error.") Thus, this suggests that "competitors may arrive at similar solutions through a general process." *CNG*, 2021 WL 4189577, at *12 (citing *Brakefire, Inc. v. Overbeck*, 2007-Ohio-6464, ¶ 25, 144 Ohio Misc. 2d 35, 52, 878 N.E.2d 84, 96 (Ohio 2007)). Finally, as in *CNG Fin. Corp.* and for the reasons discussed above, Plaintiff fails to clearly establish how the processes that Ms. Mahan used to do her work are trade secrets rather than a general skill practiced in the industry. An employee possessed of her employer's trade secrets "[has] the right to take employment in a competitive business, and to use h[er] knowledge (other than trade secrets) and experience, for the benefit of the new employer.'" *Hydrofarm, Inc. v. Orendorff*, 2008-Ohio-6819, ¶ 21 (10th Dist. 2008) (quoting *B.F. Goodrich v. Wholgemuth*, 117 Ohio App. 493, 500 (9th Dist. 1963)).

As discussed above, Plaintiff also failed to put forth either direct or circumstantial evidence of misappropriation of any asset. While Plaintiff "is not required to prove actual misappropriation under the inevitable disclosure doctrine, its inability to coherently describe what [Ms. Mahan] will inevitably appropriate is telling." *CNG Fin. Corp.,* 2021 WL 4189577, at *13. As in *CNG Fin. Corp.,* Plaintiff here "[f]ails to answer the question of exactly what...[defendant] is alleged to have taken with [her] when [s]he left...." *Id.* (citing *A&P Tech., Inc. v. Lariviere,* No. 1:17-CV-534, 2017 WL 6606961, at *10 (S.D. Ohio Dec. 27, 2017)). Specifically, Mr. Macias' testimony at the hearing that Ms. Mahan possesses knowledge "in her brain" does not clearly demonstrate at this stage of the proceeding what Ms. Mahan will inevitably appropriate. *See Degussa Admixtures, Inc.*

26

*v. Burnett*, 277 F. App'x 530, 535 (6th Cir. 2008) (plaintiffs fail to state a "cognizable" inevitable disclosure doctrine claim when they merely rely on "generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets"); *A&P Tech., Inc.*, 2017 WL 6606961, at *10 (finding that plaintiff's generic labels for trade secret information "fail[ed] to answer the question of exactly what technology [the former employee] is alleged to have taken with him when he left [employment]"). Accordingly, Plaintiff fails to show it is entitled to relief under the inevitable disclosure doctrine.

In sum, Plaintiff does not meet its heavy burden in demonstrating likelihood of success on the merits of its misappropriation of trade secrets claims under the DTSA or the Ohio Uniform Trade Secrets Act.

### 4. *Civil Conspiracy*

Finally, Plaintiff asserts a civil conspiracy claim arising from Fetch and Ms. Mahan's "combined efforts" to commit the unlawful acts, including Ms. Mahan's breach of her employment agreement, Fetch encouraging this breach, and Defendants' actual and threatened misappropriation of Plaintiff's trade secret, confidential, and proprietary business information. (ECF Doc. 4-2, PageID#143-44). To establish a civil conspiracy claim, the plaintiff must demonstrate: (1) a malicious combination of two or more persons; (2) causing injury to another person or property; and (3) the existence of an unlawful act independent from the conspiracy itself. *Bentkowski v. Trafis*, 56 N.E.3d 230, 243 (Ohio Ct. App. 2015) (citing *Kelley v. Buckley*, 950 N.E.2d 997 (Ohio Ct. App. 2011) (further citations omitted)).

Plaintiff's civil conspiracy claim falls short because it fails to establish the likelihood of success on the merits for its breach of contract, tortious interference with contractual relationships, and misappropriation of trade secret claims under either the DTSA or the Ohio Uniform Trade

Secrets Act. Under Ohio law, "an underlying unlawful act is required before a civil conspiracy claim can be successful." *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996) (citing *Minarik v. Nagy¸*193 N.E.2d 280, 281-82 (Ohio Ct. App. 1963)). Accordingly, Plaintiff fails to establish a likelihood of success on the merits for its civil conspiracy claim.

In sum, Plaintiff fails to establish a likelihood of success on the merits of any of its claims. Significantly, although no single factor is determinative, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000); *Transtar Industries, LLC v. Lester*, No. 1:19cv1230, 2019 WL 3458456, at *4 (N.D. Ohio July 31, 2019). Accordingly, this factor weighs heavily against awarding injunctive relief.

### B.  Irreparable Injury

The second factor in weighing whether to grant injunctive relief is whether the moving party would suffer irreparable injury without an injunction. Mere injuries, however substantial, are not enough. *Michigan Coalition of Radioactive Material Users, Inc.*, 945 F.2d 150, 154 (6th Cir. 1991). Rather, "the harm alleged must be both certain and immediate, rather than speculative or theoretical." *Id. See also NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943 (6th Cir. 2007); *Hunt v. Mohr*, 2011 WL 4467764, at *3 (S.D. Ohio Sept. 26, 2011). Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Plaintiff here has not shown irreparable harm. Plaintiff argues that it will experience irreparable injury "so long as Mahan continues to violate the Agreement, the DTSA, and the OUTSA, in her new position, because [Plaintiff] will continue to lose customers, employees, business relationships, and goodwill, which cannot be fully compensated by monetary damages."

(ECF Doc. 4-2, PageID#147-48). Specifically, Plaintiff contends that Ms. Mahan's "broad and detailed knowledge" of Plaintiff's business, programs, customers, services, pricing, and strategies will be "impossible to not employ while underwriting and marketing Fetch's competing insurance products and services." (*Id.* at PageID#48). However, as discussed at length above, Plaintiff has not presented clear and convincing evidence that it is likely to succeed on the merits of any of its claims.

Further, the "harm" Plaintiff alleges appears to be more speculative or unsubstantiated than actual and imminent. At the time of the hearing, six weeks had elapsed since Ms. Mahan started working for Fetch. But there is no evidence that Ms. Mahan has disclosed any confidential information or that Fetch has requested or utilized such information. At the hearing, Plaintiff suggests that knowledge of Plaintiff's confidential information is "in [Ms. Mahan's] brain" and speculates that she is using its alleged confidential and trade secret information. Yet Plaintiff demonstrates no actual or imminent risk of harm, such as customers or employees leaving or threatening to leave Plaintiff for Fetch, since Ms. Mahan started working for Fetch. Therefore, the second element of the injunction test weighs against granting injunctive relief.

### C. <u>Substantial Harm to Others</u>

The third factor considered is whether the issuance of an injunction would cause substantial harm to others. "The irreparable injury [the plaintiff] will suffer if [its] motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). As set forth above, Ms. Mahan would likely suffer financial hardship if Plaintiff were to prevail in this action and would be required to forego a significant employment opportunity.   But "*[i]f* the non-compete was enforceable as written, any detriment to [Ms. Mahan] would be caused

by her own breach." *Concentrix,* 2021 WL 1734284, at \*13 (emphasis in original) (citing *Avery Dennison Corp v. Kitsonas*, 118 F.Supp.2d 848, 855 (S.D. Ohio Oct. 12, 2000) ("Any harm to [defendant] would be as a direct result of h[er] own actions" in breaching restrictive covenants in an employment agreement.)). Accordingly, the third element weighs slightly in favor of Plaintiff.

### D. **Public Interest**

The final factor is whether the public interest would be served by the injunction. Here, the public interest considerations are equally balanced between the parties. Under Ohio law, "[p]reserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest." *Total Quality Logistics, LLC v. OTC Logistics LLC*, No. 1:19-CV-151, 2019 WL 1300223, at \*5 (S.D. Ohio Mar. 21, 2019) (quoting *UZ Eng'red Prods. Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1068, 1081 (Ohio Ct. App. 2001)). Yet, on the other hand, broad restrictive employment covenants can stifle competition. There is also an interest in "not restricting employment opportunities for employees." *Convergys*, 2007 WL 428202, at \*11. Accordingly, this factor is neutral.

## V. **RECOMMENDATION**

For the foregoing reasons, I RECOMMEND that the Court DENY Plaintiff's motion for a temporary restraining order and preliminary injunction.

Dated: October 10, 2023

s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VI. **NOTICE TO PARITES REGARDING OBJECTIONS**

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period**

**shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).